# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Monica Niculcea,               :
           Petitioner       :
                               :
         v.                :    No. 382 C.D. 2015
                               :    Submitted: September 11, 2015
Unemployment Compensation    :
Board of Review,               :
           Respondent    :

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                **FILED: November 18, 2015**

Petitioner Monica Niculcea (Claimant), acting *pro se*, petitions for review of an order of the Unemployment Compensation Board of Review (Board). The Board affirmed an unemployment compensation referee's (Referee) decision denying Claimant unemployment compensation benefits pursuant to Section 402(e) of the Unemployment Compensation Law (Law),[1] relating to willful misconduct. For the reasons set forth below, we affirm the Board's order.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

Stoneridge Retirement Living Community[2] (Employer) terminated Claimant's employment as a registered nurse supervisor. Claimant filed for unemployment compensation benefits. The Allentown UC Service Center (Service Center) issued a determination, finding Claimant eligible for benefits. (Certified Record (C.R.), Item No. 6.) Employer appealed the Service Center's determination.

The Referee conducted an evidentiary hearing, during which Claimant testified and Employer presented the testimony of four witnesses: James Lucy, Employer's Vice President of Human Resources; David Johnson, Employer's Nursing Home Administrator at Stoneridge Towne Center; Linda Carter, Employer's Director of Nursing at Stoneridge Towne Center; and Rebecca Schnoke, a Licensed Practical Nurse who worked for Employer at the time of Employer's termination of Claimant's employment.

Mr. Lucy testified that Employer employed Claimant as a registered nurse supervisor. (C.R., Item No. 10 at 11.) Mr. Lucy introduced into evidence Employer's handbook, which includes a standard of conduct policy that prohibits abuse or inconsiderate treatment of residents. (*Id.* at 12.) Violation of the standards of conduct policy may result in termination. (*Id.*) Mr. Lucy testified that Claimant received a copy of the handbook and that the policy has been in effect throughout her employment. (*Id.* at 13-14.)

Ms. Carter testified that Employer has a policy that residents have the right to refuse treatment. (*Id*. at 15.) If a member of the nursing staff forces a

---

[2] By order dated May 12, 2015, the Court granted the application to intervene filed by Employer.

treatment upon a resident over the objection of the resident, Employer views the staff's action as abuse. (*Id.*) On April 24, 2014, Ms. Carter received a report that a nurse had engaged in possible abuse the previous day. (*Id.* at 17.) She conducted an investigation and learned that Claimant performed a skin assessment of a new admission and the person did not want to have a skin assessment performed of her bottom. (*Id.*) Ms. Carter described a skin assessment as "checking a person's skin for any open areas, bruises, skin tears, things like that." (*Id.*) Ms. Carter testified that it was reported to her that Claimant "asked the resident to stand up, but did not tell her she was going to remove her brief or pants to check her bottom, just took them down." (*Id.*) The resident then became extremely upset and agitated and left the facility against medical advice. (*Id.*) As a result of the investigation, Employer suspended and then terminated Claimant's employment. (*Id.* at 18.)

Ms. Carter explained that a skin assessment is not a treatment, but is part of the policy and procedure for the admission of a resident. (*Id.* at 40.) She testified that a resident has the ability to refuse a skin assessment. (*Id.*)

Mr. Johnson testified that he was involved in the investigation of the allegations of abuse. (*Id.* at 22.) He interviewed two witnesses and the resident's daughter. (*Id.*) As a result of the investigation, he was required to report the incident to various agencies. *(Id.* at 22-23.) On cross-examination, he testified that the statements made by the two witnesses and resident's daughter corroborated each other. (*Id.* at 23.)

Claimant testified that she was aware of Employer's policy prohibiting abuse of a resident and that a resident has a right to refuse treatment. (*Id.* at 27.) She was also aware that she could be disciplined for abuse for forcing a resident to submit to a treatment. (*Id.*)

3

Claimant testified that on April 23, 2014, she went to the floor to assist the nurses. When she asked Ms. Schnoke where the resident was, Ms. Schnoke informed her that the resident was in the dining room instead of her room because the resident did not want her to do an assessment. (*Id.* at 27-28.) Ms. Schnoke said that the resident wanted to go home. (*Id.* at 28.) Claimant convinced the resident to return to her room for an assessment. (*Id.*) Back in the room, Claimant sat on the bed, facing the resident who was sitting in a wheelchair. (*Id.*) Claimant asked the resident about a scab on her leg and asked if she could measure the scab and bruising. (*Id.*) The resident agreed. (*Id.*) Claimant checked the resident's arms and hands. (*Id.*) The resident put her legs on Claimant's lap, and Claimant looked at a scab and bruises on her legs. (*Id.*) Ms. Schnoke documented the measurements. (*Id.*) The resident then took her legs off of Claimant. (*Id.*) Resident then said that she wanted to go home, that she knew this place, and that she did not want to stay here. (*Id.*) The resident asked Claimant to put her slippers on her, which Claimant did. (*Id.*) Claimant testified that the resident then tried to stand up, but Ms. Schnoke pushed the resident back down into to the chair from behind and went to block the door with her back. (*Id.*) Claimant told Ms. Schnoke to let the resident go, and Claimant opened the door. (*Id.*) Claimant walked out and the resident "was out and yelling and screaming." (*Id.*)

Claimant testified that she did not do anything. (*Id.*) She also testified that Ms. Schnoke, apparently in a statement given to Employer, referred to a "bar" in the resident's room. (*Id.*) Claimant testified that the facility is "restraint free" and that there is no bar or side rail in the room. (*Id.*)

4

Claimant also testified that when Ms. Schnoke pulled the resident down, she grabbed her hips and pulled downward, grabbing the resident's clothes and gown. (*Id.* at 28-29.) When the resident stood up, the resident lifted her gown from the front to open and tie her short pants and began screaming. (*Id.* at 29.) Claimant was the first out of the room and went to find out what to do about the situation. (*Id.*)

With regard to the skin assessment, Claimant explained that the nurse's policy requires nurses to evaluate all residents upon admission using the Braden Scale without exception. (*Id.*) She explained that she did not tell the resident that she needed to check her behind, and Claimant never checks a resident's behind while they are standing. (*Id.*) Rather, she does it while the resident is lying down. (*Id.*)

When asked if the resident had told Claimant at any point that the resident no longer wanted to continue with the skin assessment, Claimant testified that the resident did not say anything and just stood up. (*Id.*) Claimant observed her behavior so that she could document it. (*Id.* at 29-30.) Claimant also explained that policy requires nurses to perform the skin check by midnight on the day of admission, because, otherwise, Medicare or Medicaid may not pay the facility for a reimbursement if there is a skin problem. (*Id.* at 30.) If a resident has not completed the assessment before going to bed, Claimant or the certified nurse's assistant usually will do this during the resident's "p.m. care." (*Id.* at 31.)

Claimant testified that, following the incident, the director of nursing instructed her to print off a paper discharging the resident against medical advice. (*Id.* at 33.) She reiterated that the resident agreed to allow her to perform the assessment. (*Id.* at 34.) She did not tell the resident that she needed to check her

5

behind, there was no bar in the room, and she did not pull down the resident's briefs. (*Id.*) Claimant contended that after Ms. Schnoke pulled the resident down from the waist, the resident lifted the gown and tied her pants because Ms. Schnoke made it loose when she pulled down. (*Id.*)

On cross-examination, Claimant disputed that a full body skin assessment is a necessary part of a treatment plan. (*Id.* at 36.) Rather, she testified that it is an admission tool, not a treatment. (*Id.*) She agreed that it is a required procedure upon admission of a resident to the facility. (*Id.*) She testified that a resident has a right to refuse any portion of the skin assessment, but she clarified that she did not check the resident's bottom in this instance. (*Id.* at 36.) She was going to do it when the resident went to bed so as not to make the resident worse. (*Id.* at 37) Claimant testified that she had never seen a co-worker push a resident down like Ms. Schnoke did. (*Id.* at 37-38.) She described Ms. Schnoke's actions as unprofessional but was not sure whether it qualified as abuse. (*Id.* at 38.)

Ms. Schnoke[3] testified that in April 2014, she began a new job with Employer as a licensed practical nurse, having previously worked for Employer as a certified nurse assistant since 2010. (C.R., Item No. 14 at 4.) On April 23, 2014, she was working with Claimant, and Claimant was training her. (*Id.*) Ms. Schnoke testified that Claimant informed her that there was a new admission on the floor and that Claimant would perform a skin assessment because it was Ms. Schnoke's first admission. (*Id.*) During the skin assessment, Ms. Schnoke observed, took notes, and measured one bruise on the resident's left check. (*Id.*)

---

[3] Although called as a witness for Employer, Ms. Schnoke testified following Claimant's testimony, because Ms. Schnoke was not available on the first day of the hearing.

For the most part, she merely documented what Claimant stated to her. (*Id.*) She testified that Claimant performed a skin check on the resident by observing her arms, legs, chest, and back. She asked the resident to stand up so she could assess her bottom, and the resident said no. (*Id.* at 5.) Claimant then redirected the resident and asked if she could listen to her heart, lung, and bowel sounds, which also is part of an assessment upon admission. (*Id.*) The resident agreed, so Claimant listed to those sounds. (*Id.*) Ms. Schnoke further testified:

> After that [Claimant] then asked that the resident grab a hold of the transfer bar that was in fact attached to the bed frame at that point. She did that. She grabbed a hold of the bed transfer bar and stood up which at that point her backside was directly in front of [Claimant]. And [Claimant] grabbed the back of her shorts and tugged down which exposed some of that person's bottom.

(*Id.*) The resident became very frantic, scared, and anxious, and she turned around, grabbed her shorts, and backed against a wall, screaming not to touch her and get away. (*Id.*) Ms. Schnoke was afraid that the resident would fall, particularly because there were so many objects in the small area where they were. (*Id.* at 6.) She moved the wheelchair slightly so if the resident needed to sit down, she could sit down in it. (*Id.*)

Ms. Schnoke testified that she did not report that situation because she assumed Claimant reported it when she called Ms. Carter about discharge paperwork. (*Id.*) The next morning, Ms. Schnoke received a call from Employer inquiring about what happened the prior evening. (*Id.*) She explained to Ms. Carter, Mr. Johnson, and others what happened. (*Id.*) She also prepared a written statement. (*Id.*)

On cross-examination, Ms. Schnoke testified that a transfer bar is something with which therapy deals, and it is not a restraint. (*Id.* at 13.) The beds

7

have transfer bars but not rails. (*Id.* at 13-14.) Therapy assesses whether a resident needs a transfer bar. (*Id.* at 13.) If a resident needs one, it is attached to the bed. If the resident does not need one, it is not attached to the bed. (*Id.*) She denied pushing the resident down when she stood up. (*Id.* at 22.)

The Referee denied Claimant benefits, concluding that Claimant's conduct amounted to willful misconduct. The Referee made the following findings of fact:

1. The claimant was last employed as a full-time registered nurse supervisor by Stoneridge [R]etirement [L]iving [Community] from January 6, 2003, until April 23, 2014, working 32 hours per week at a final rate of pay of $30.52 per hour.

2. The employer has a policy which acknowledges a [resident]'s[4] right to refuse any treatment.

3. The claimant was aware of the policy.

4. Procedures for admission of a new [resident] include a skin assessment that involves viewing all parts of the patient's skin and regarding any blemishes, bruises or other anomalies.

5. On April 23, 2014, the claimant was conducting a second estimate for a newly admitted [resident], when the [resident] indicated that the claimant did not have to do her "bottom."

6. Despite the patient's protest, the claimant's [sic] pulled down her undergarments to view the [resident]'s buttocks.

7. The employer discharged the claimant for violation of the [resident]'s rights.

---

[4] Throughout the hearing and in the briefs filed with the Court, the parties referred to persons residing in the nursing home interchangeably as "residents" or "patients". For sake of consistency, we have referred to them throughout the opinion as "residents."

(C.R., Item No. 15.)

In concluding that Claimant engaged in willful misconduct, the Referee reasoned:

> In the present case, the credible testimony of the employer's witness establishes that it has a policy which acknowledges the [resident]'s right to refuse treatment. The claimant was aware of the policy. The credible testimony of the employer['s] witness establishes that after a protest by the [resident], the claimant attempted to complete her skin assessment by viewing the [resident]'s buttocks. The referee rejects the claimant's testimony denying these actions. The referee also rejects the claimant's assertion that she did not violate the policy because the skin assessment is not treatment. Regardless of whether a skin assessment is actually treatment, referee believes, based on testimony of the employer, that a [resident] would have the right to refuse to participate in the skin assessment. The credible testimony establishes a violation of the employer's policy and the claimant does not present any good cause for her actions. Therefore, the employer has established that it discharged the claimant for actions that constitute willful misconduct connected with the work and benefits will be disallowed under Section 402(e) of the Law.

(*Id.*)

Claimant appealed to the Board, which affirmed the Referee's decision and adopted the Referee's findings and conclusions. In so doing, the Board explained:

> The Board credits the testimony of the employer's witness that the claimant pulled the [resident]'s pants down after the resident objected to a skin check of that area. The [resident] then because upset and left the facility against medical advice. The claimant did not inform the employer that any other staff had acted improperly toward the [resident]. The Board does not credit the claimant's testimony that that was the case.

9

(C.R., Item No. 23.)  Claimant then petitioned this Court for review.

On appeal,[5] Claimant argues that substantial evidence of record does not exist to support the Board's findings of fact.  Claimant also argues that the Board committed an error of law in concluding that she engaged in willful misconduct.

We first address Claimant's argument that substantial evidence of record does not support the Board's findings of fact.[6]  Claimant appears to take issue with findings of fact numbers 6 and 7, because, she contends, that she followed company policy and procedure for skin assessment, that she did not perform a "treatment," that she did not pull down the resident's pants, and that she

---

[5] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence.  Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[6] Substantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion.  *Johnson v. Unemployment Comp. Bd. of Review*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986).  In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence.  *Id.*  A determination as to whether substantial evidence exists to support a finding of fact can only be made upon examination of the record as a whole.  *Taylor v. Unemployment Comp. Bd. of Review*, 378 A.2d 829, 831 (Pa. 1977).  The Board's findings of fact are conclusive on appeal only so long as the record, taken as a whole, contains substantial evidence to support them.  *Penflex, Inc. v. Bryson*, 485 A.2d 359, 365 (Pa. 1984).  "The fact that [a party] may have produced witnesses who gave a different version of the events, or that [the party] might view the testimony differently than the Board is not grounds for reversal if substantial evidence supports the Board's findings."  *Tapco, Inc. v. Unemployment Comp. Bd. of Review*, 650 A.2d 1106, 1108-09 (Pa. Cmwlth. 1994).  Similarly, even if evidence exists in the record that could support a contrary conclusion, it does not follow that the findings of fact are not supported by substantial evidence.  *Johnson v. Unemployment Comp. Bd. of Review*, 504 A.2d 989, 990 (Pa. Cmwlth. 1986).

did not do "a second estimate for a newly admitted resident."[7] (Petitioner's Br. at 7.)

In finding of fact number 6, the Referee and Board found that Claimant pulled down the resident's undergarments to view her buttocks. Claimant argues that the Board erred in crediting the testimony of Ms. Schnoke that Claimant pulled down the resident's pants over her testimony to the contrary. With regard to this finding, Claimant is essentially asking that we revisit the Board's credibility determinations. This we are unable to do. In an unemployment compensation case, it is well-settled that the Board is the ultimate fact finder and is, therefore, entitled to make its own determinations as to witness credibility and evidentiary weight. *Peak v. Unemployment Comp. Bd. of Review*, 501 A.2d 1383, 1386 (Pa. 1985). Questions of credibility are not subject to re-evaluation on judicial review. *Id.* at 1388. Accordingly, we will not revisit the Board's determination that Employer's witnesses testified credibly. Moreover, Ms. Schnoke's testimony that Claimant pulled down the resident's pants constitutes substantial evidence of record to support the finding.

With regard to finding of fact number 7, the Referee and Board found that Employer discharged Claimant for a violation of the resident's rights. Claimant's argument that finding of fact number 7 is not supported by substantial evidence of record appears to be based on her contention that she did not pull down the resident's pants. We have concluded, however, that there is substantial

---

[7] Claimant also disputes Employer's testimony that there was a bar in the resident's room, although we note that whether a bar was present was not the subject of a finding of fact. Had the Referee and Board made such a finding, there was testimony of record that could support such a finding.

evidence to support a finding that Claimant did pull down the resident's pants over her objection. Claimant's argument also appears to be based on her contention that a skin assessment is not a treatment, and, therefore, even if she did pull down the resident's pants over the resident's objection, it would not be a violation of a resident's right to refuse treatment. Employer does not dispute that a skin assessment is not a treatment. Rather, both parties appear to be in agreement that a skin assessment is to be performed pursuant to the procedures for the admission of a new resident. During the hearing, Ms. Carter testified that a resident has the ability to refuse a skin assessment. (C.R., Item No. 10 at 40.) Claimant even testified that a resident has a right to refuse any portion of the skin assessment. (*Id.* at 36.) Thus, substantial evidence exists to support the finding that Claimant violated the resident's right not to have a full skin assessment performed.

Next, we will address Claimant's argument that the Board erred in concluding that Claimant engaged in willful misconduct. Section 402(e) of the Law provides, in part, that an employee shall be ineligible for compensation for any week in which "his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." The employer bears the burden of proving that the claimant's unemployment is due to the claimant's willful misconduct. *Walsh v. Unemployment Comp. Bd. of Review*, 943 A.2d 363, 369 (Pa. Cmwlth. 2008). The term "willful misconduct" is not defined by statute. The courts, however, have defined "willful misconduct" as:

> (a) wanton or willful disregard for an employer's interests, (b) deliberate violation of an employer's rules, (c) disregard for standards of behavior which an employer can rightfully expect of an employee, or (d) negligence indicating an intentional disregard of the employer's interest or an employee's duties or obligations.

12

*Grieb v. Unemployment Comp. Bd. of Review*, 827 A.2d 422, 425 (Pa. 2003). An employer, seeking to prove willful misconduct by showing that the claimant violated the employer's rules or policies, must prove the existence of the rule or policy, and that the claimant violated it. *Walsh*, 943 A.2d at 369. Once an employer has met its burden, however, the burden then shifts to the claimant to show good cause as justification for the conduct considered willful. *McKeesport Hosp. v. Unemployment Comp. Bd. of Review*, 625 A.2d 112, 114 (Pa. Cmwlth. 1993) (citing *Mulqueen v. Unemployment Comp. Bd. of Review*, 543 A.2d 1286 (Pa. Cmwlth. 1988)).

Claimant appears to argue that she did not engage in willful misconduct by violating Employer's policy that residents have a right to refuse treatment, because, in addition to following company policy and procedure for performing skin assessments on newly admitted residents, she did not pull down the resident's pants over the resident's protest. The Board, however, found otherwise and credited the testimony of Ms. Schnoke that Claimant pulled down the resident's undergarments after the resident explicitly stated that she did not want Claimant to check her bottom. Claimant also appears to argue that she could not have violated the policy, because skin assessments are not "treatments" and, thus, are not encompassed within the resident's right to refuse treatment. Again, the Board found otherwise. Relying on testimony from Employer's witnesses, the Board found that under Employer's policy, a resident has a right to refuse a skin assessment. Employer, therefore, established that it has a policy which acknowledges a resident's right to refuse a skin assessment, that Claimant was aware of the policy, and Claimant violated the policy. In other words, Employer met its burden to establish willful misconduct.

13

Once an employer has met this burden of establishing willful misconduct, we must determine whether the claimant established good cause. *McKeesport Hosp.*, 625 A.2d at 114. To prove "good cause," a claimant must demonstrate that her actions were justifiable and reasonable under the circumstances. *Kelly v. Unemployment Comp. Bd. of Review*, 747 A.2d 436, 439 (Pa. Cmwlth. 2000). Here, Claimant has failed to argue either on appeal or at any proceedings below that she had good cause for violating Employer's policy.

For the foregoing reasons, we affirm the Board's order.

_____
P. KEVIN BROBSON, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Monica Niculcea,                           :
                  Petitioner      :
                                :
            v.                       :    No. 382 C.D. 2015
                                :
Unemployment Compensation                  :
Board of Review,                           :
                  Respondent     :

## **O R D E R**

AND NOW, this 18th day of November, 2015, the order of the Unemployment Compensation Board of Review is AFFIRMED.

 

                                  _____

                                  P. KEVIN BROBSON, Judge